May it please the court, Kara Porter and Sarah Spencer for appellants Sharla Johnson, Zibi, LLC, Zibi Flight Services, LLC, and Orange Cat Investments, LLC. We have, if it's all right with the court, we have made an arrangement with the attorney for the other set of defendants by which we will try to use about 13 minutes of our allotted time. I'm going to try to reserve three minutes for rebuttal if I'm able. And obviously there's been quite an extensive briefing in this case. I'm going to focus primarily on two points with respect to the period of time prior to when there was any service process, in other words, prior to February of 2013. The first point with respect to the... The reason that matters is because at that point your clients were amended into the case. Is that why? Right. The first acceptance of any kind of service or any attempt at any kind of service was in February 2013 when they were brought into the lawsuit. On the merits. Well, as relief defendants, which is sort of a mix. Okay. But as actual parties. Okay. You agree there was personal jurisdiction over them at that point in time by being brought in. Well, we agree that the district court denied our motion to dismiss based on lack of personal jurisdiction that we file in that. But so, you know, that is what the court currently has said. And frankly, the court also denied our argument on personal jurisdiction with respect to this motion, the motion to clarify. But there are two points we think that are extremely important with respect to that initial period. And you have to recall that the order that we're here on is that our clients were retroactively bound to a preliminary injunction as of January 2011. Now, the FTC has spent some time in their brief arguing, well, they got due process in 2013. But our clients' positions, and particularly Charlotte Johnson's positions, had materially changed between 2011 and 2013. So the argument cannot be made that you can retroactively provide due process. The trial court found that our clients were bound by the preliminary injunction in January of 2011. And that's why motions were filed for contempt. But those motions, the contempt motions, are not before the court now. No, that is not. No, and in fact, the trial court did find that it was a violation of the preliminary injunction because the injunction was binding on the parties back in January 2011. But all that is before this court is the propriety of seizing her assets from a period going forward, not a period. I understand your argument, it's a clarification motion. But what's really at issue is whether it was appropriate to freeze those assets at that point in time that the clarification motion was entered into. Well, no, at that point in time, being as of January 2011, it would be a very different argument. Remember, the clarification order was saying, I am clarifying and confirming that your clients were bound by this back in January of 2011. I don't know exactly why that matters. Oh, it matters a lot in two principal ways. First, between 2011 and when service was actually effectuated in 2013, she had, among other things, been brought into the lawsuit, and she did what most people do when they are sued, she went out and hired lawyers. And part of the payment for that was basically what she had. Whatever equity was left in the house after all the liens and all that was going to go toward payment of that, payment toward expert fees. But if once she was served, there was a freezing at that point, what difference does it make? Because she did that before she was served. You see, she did that when she was not bound by the preliminary injunction. Her assets were not bound by the preliminary injunction. She did it earlier in 2013. The original motion to amend was in January. And then word got out that there had been a motion filed. The service was by acceptance of service. They hired us and said, here's the only way we can pay you. And we, rather than have Jeremy Johnson's mother have a knock on the door by a sheriff, arranged for acceptance of service. So the whole transaction by which she was intending to have a day in court depends on whether or not she really was bound and her assets really were bound as of January 2011 rather than March of 2013. Not to mention the fact that the court has issued a ruling that my firm, myself, for the first time in 25 years, supposedly violated a court order. That matters. But it's a big issue in this case. And one reason I think why the FTC wants you to focus on 2013 and not 2011 is because I really don't believe they can get around San Vicente in two ways. First, the San Vicente case, which I think is dispositive of the first issue, says with respect to binding a non-party to a preliminary injunction, there have to be minimum contacts. They aren't even alleged. Even now they don't allege that there are minimum contacts. Charlotte Johnson, the LLCs, which have been in existence long before the alleged improper conduct of her husband, those are all Utah entities. They don't allege contacts. And also another ---- So all of the, let me see if I can clarify this. All of the assets of what we've referred to as the Charlotte Johnson defendants, are they all in Utah? They are. All of them. So why didn't the filing of the, filing under 28 U.S.C. 754, why isn't that dispositive? That gave them jurisdiction over anything in Utah. Except it didn't, because under this court's opinion in Ross, even if 754 does apply to relief defendants with nationwide service, there's a mechanism that has to be followed, and that is service of process. This court in Ross said 754 or minimum contacts may provide a basis for exercising jurisdiction, but the court does not have that jurisdiction or that power until service of process, the mechanism is what the court called it, has been followed, which is Rule 4 or Rule 4.1 if it's not a complaint. But they were all served here, all of the Charlotte Johnson defendants. But not until after the events in question here. They were not served until the FTC served them in late February of 2013. There was never a service of process of the 754 filing. There were one or two documents after the preliminary injunction was entered that the receiver says he mailed to Mrs. Johnson. But I believe neither the receiver nor the FTC claims that she was ever given any notice whatsoever prior to entry of the preliminary injunction in 2011. And that does matter also because the San Vicente case says not only do you have to have minimum contacts to bind a non-party or their assets, as Schaefer v. Heitner says, person, assets, same standard, but it also says as in any case, you have to, the person has to have notice and an opportunity to be heard. Now, remember, the ruling here was that she was bound back in January 2011. No one claims. But she had notice of the clarification motion. I mean, that was served on her and her husband. Well, actually, even that wasn't. It was, again, mailed. We found out about it by checking the docket. We went and we did make an argument. I don't deny it. You were there. She had the opportunity and the other entities had the opportunity to make arguments. Yeah. So as of 2013, we would, as of the day we argued in 2013. Or as of the day she was served or had notice. Or even as of the day of service, we would have a more difficult argument on that issue. But we're talking about 2011. That's what the trial court held, that she, that Charlotte Johnson was bound as of January 2011. The problem is that underlying all this is that she really didn't have any assets. She only had, she was only the nominal holder of these assets. They weren't hers. Well, I don't think that's. I mean, so you have somebody who is claiming a right to assets that the ultimate finding was that she didn't actually own any of these assets. Well, there hasn't been an ultimate finding. Not ultimate, but a preliminary holding. Well, the court, actually, there aren't any fact findings in the court, if you look at that. The court does indicate that Charlotte Johnson's assets are receivership assets. But interestingly, there aren't any fact findings as to really why that is. Well, but there's this long report and the declaration by the receiver, all of which seem to say that she, for example, that the house was transferred to her name, but she had no capital investment in it. Well, frankly, that's true with a lot of spouses. I mean, she took care of their children. She worked at the company as it was trying to be built, et cetera. You know, to suggest that she didn't contribute in any way to that I just don't think is a fair statement. She didn't contribute to any of the assets of the entity, I mean, the entities. There was no showing there that she made any contribution to those. She had a 50 percent interest, but she made no contributions to the capitalization. Not to the capitalization, but under Utah's LLC law, as I think the LLC law in every state, capitalization is just one way of making a contribution. But you can have a partnership of sorts with your spouse or with other people. It doesn't make the LLCs in any way, you know, somehow invalid. I mean, that's specifically provided. So your notion that she was entitled to notice and hearing, or at least to service, is based on the fact that she was the record owner of this property. And the question of whether she actually had any beneficial interest, you would say, as I understand what you're saying, it's just not relevant to that question. And that's true. The fact that she was the title owner and predating this litigation, even under the productive management case cited by the receiver, that court says if you're talking about the title owner, then San Vicente applies. And you've got to have minimum contacts and notice and an opportunity to be heard. She's not like Wells Fargo. Wells Fargo would never be able to keep up. But the minimum contacts is kind of out of this case, isn't it, because of the 754 notice. So it's really just a service and opportunity to be heard. Well, yeah, I suppose in that sense, if you're going to, we have other arguments, but from what we're discussing right now, I think that that's true. But I think that the problem here, again, as we've indicated, is the receiver, who did absolutely nothing, didn't name her in the motion, didn't send her any notice of the hearing, this is back in 2011, never mentioned her at any point, and yet two years later is saying, okay, now we're going to go retroactive and now we're going to undo the one asset that she had that could partially pay for her defense in this case. I mean, a receiver and her counsel who, frankly, I mean, they've been paid $6 million for the work they've done in this case. She just wants a chance to be able to hire a lawyer in some way. And she was not bound, her assets were not bound until service of process. We really think the cases that we cited in our brief really did support that. And I feel a little bit difficult. I did promise my counsel I would not go over. And the main cases are Ross and San Vicente? Pardon? The main court cases are Ross and San Vicente? San Vicente would be our main one, Ross, and then we cited some district court cases and a couple of Ninth Circuit unpublished cases that all follow San Vicente. But in terms of presidential cases of this court, those are the two? Those would be the big ones. And I would look at Hickey as well if you're looking at the issue of control because how does a husband control his wife? And that's what they have to show under Hickey. But as I understand it, that's not relevant to your argument. Oh. Because your argument is as the title holder, whether she was completely controlled or anything else, as the title holder she was entitled to service. I completely agree. That is right. I just have a fallback in case the court disagreed with that argument that even at the control it's still under the Hickey case you'd still have to find that a husband by definition controls his wife because this court said in Hickey it's not the asset we're looking at, it's the entity. But I did promise my counsel I would not try to use up all the time. If I may still try to reserve some time for rebuttal. Thank you. Good morning. Michael Sudebaker for the remaining parties on the appeal. With the issue of service, my clients weren't served either. They have never been named as a party to the litigation. They were not present. I thought some of them were named as a party to litigation. I'm sorry, Your Honor? I thought some of them were, in fact, named as a party to litigation. That's correct. Dwayne Fielding, Anthon Holdings, and Network Agenda were. And they've been subjected to the preliminary injunction which the trial court issued. But they don't have any interest in the clarification motion, nothing. The clarification motion didn't take any action with respect to them, correct? To an extent. I believe so. To an extent or yes? No. And the reason I – the two corporations, Anthon and Network, yes. Dwayne Fielding peripherally because he's also tied into the fact of and has an interest in these other parties that have been added to it. So his interest isn't as strong as the interveners, if you will. But he got notice of the – Dwayne Fielding did receive notice. That is correct. He was actually represented by counsel and to that effect. The new parties were never named, never received notice. But SLI and Trigger, they're owned 50% by him, correct? They are. So if he got notice, those corporations, in effect, got notice, correct? The SLI and Trigger were an older issue and they keep getting drug into this. The key issue here, really, if we're going to narrow the issue down for the court and for counsel, is the rotor trends slash I prerogative issues. And those are the issues because related to helicopters that the receiver is now trying to say are tied to Jeremy Johnson and I works. And these parties, we're talking two-plus years later, are now all of a sudden getting drug into litigation when the trial – So let me repeat the question that I asked before. I understand why it might matter to her when she was subject to the freeze order. Why does it matter to your clients? To which clients, Your Honor? You just told us that we should be concentrating on rotor trends and I prerogative. So let's concentrate on that. Okay. It matters to them because of the fact that now, all these years later, they're being drug into litigation when they weren't even subjected to – But that's a different issue than the one that your colleague was raising then because you're saying that they can't even now be treated as relief defendants. They cannot be treated as relief defendants. Even though they did have notice of the hearing and they could have put on evidence as to their relationship with regard to the assets. They were not brought into – are we talking about – And they weren't named in a complaint. I understand that. Right. But they did get notice of the clarification motion that their assets were going to be treated as assets of Jeremy Johnson and they were going to be frozen. Right. They did receive – And they could have appeared in an argument. They did appear in an argument. And they did. I was actually their counsel of record at that argument. And you could have introduced evidence. So what's your problem? The problem was that the trial judge erred by determining that somehow these two entities are tied to Jeremy Johnson. So it's substantive. You have a substantive argument. You don't have a procedural argument. Correct. I'll narrow it down to the fact that my clients, they didn't receive actual service. They heard about it. I was retained. I appeared. We opposed. So it's a completely different argument than was made by your counsel. Right. Because my clients are not being – Your argument is a substantive argument that he hasn't proven sufficiently that these are really Jeremy Johnson's assets. Correct. And the difference between our two sides are they're not trying to go back yet to 2011 and seize Rotor Trend's assets. Right. And so, to me, that's the differences. The difference is procedurally and substantively is my clients, they didn't put on the evidence enough – there was conflicting evidence about the ties to – Why? Excuse me? Why not? Why didn't they put on the evidence? Because the trial judge just said we agree with the receiver and so be it. And you said I'd like to put on some evidence to the contrary, it's incorrect? Well, we were prepared to – we were down there for oral arguments. And what actually happened was, and it's in the transcripts, as soon as the trial judge came out, she basically told everybody who was present, I've already kind of made up my mind, go ahead and say what you have to say, and went from there. Were you precluded from putting evidence on at that hearing? Yes. Did the judge preclude you, say no, I don't want to hear anything, no, you can't talk to me, no, you can't put on any evidence? Did that happen? On evidence, no, she did not say those specific – what she did say was I've pretty much made up my mind, go ahead and try because – Did you try before the hearing to put on – to introduce any affidavits or anything? Well, you put in affidavits to our opposition to the motion to clarify, yes, Your Honor. Where are your – I'm sorry. Where are the assets of Rotter Tens and I prerogative SLI, where are they? Are they outside of Utah? I don't know the assets yet, Your Honor. I just don't know where they are. I've never asked about that because it's just never come up. They're trying to get the assets. To the extent that they are in Utah, there's the filing under 28 U.S.C. Section 754. And there may very well be. But I just – I'm trying to misrepresent to the court. I don't know where the assets are at this time. That's kind of the inherent disadvantage that we have is the fact when the trial judge came out and made these statements and then, you know, let it – But what does your opposition say? Where is your opposition in the record? My opposition in the record is we did file oppositions after that issue. And my opposition – and I only have information related to that – but roughly in the record about 200 – page 200 or so. And what does it say? It says here's the evidence that this really isn't Jeremy Johnson's assets. You're correct. I cite two statements from Dwayne Fielding. And in my record, it's page 248, 249, statements from Jeremy Johnson, Scott Levitt, Kevin Pilon. We cite two liens related to the helicopters and how to organize – But you essentially got to put on evidence and the district judge disagreed with you. The district judge – we put on what we had. But the reality was because – and I think because there was no actual evidentiary hearing where we could put on, for example, Mr. Pilon or even Mr. Johnson, if you so wish to testify, he's got some pending criminal cases. Did you ask for an evidentiary hearing? No, I never filed a motion for an evidentiary hearing. Did you stand up and say, judge, you shouldn't be deciding this because we have to have an evidentiary hearing? Did I make those specific requests? No, I did not. We went down there to make the argument. The judge actually – our intention was, had not the judge – my intention, I guess. I can only speak for myself. My intention was, had the judge not made that statement from the get-go, it was to anticipate we would have a – It's not very unusual for a judge to sort of give a tentative ruling that doesn't preclude you from saying whatever you want to say. That's true. I mean, it does not – You're making a mistake because we're entitled to an evidentiary hearing. You're right. I did not use those specific words, Your Honor. That's correct. So – and unless the court has anything specific, I am out of time also, and I definitely don't want to interrupt anybody else's argument on that matter. Good. Thank you. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. Gary Karas of McKenna, Long & Aldridge, appearing on behalf of the appellee receiver, Rob Evans, of Rob Evans & Associates. I've requested 13 minutes of argument time, and Mr. Singer of the Federal Trade Commission has requested seven minutes. Let me address the point initially made by Ms. Porter with respect to the issue of the Securities and Exchange Commission v. Ross case. Counsel is conflating the twin purposes of 28 U.S.C. Section 754. There's the statutory purpose, which is to get the in rem jurisdiction over the assets when the filing of the complaint and the preliminary injunction order is made by the receiver within 10 days. It's undisputed that my client complied with that statute. In what states? In Utah. Just in Utah. Just in Utah, Your Honor. Well, we also complied in California, but the only assets that are really – Do we know where these assets are? Yes, Your Honor. The only evidence in the record is that my client has filed in all jurisdictions where there are assets, namely Utah and California. Suppose there are assets somewhere else. Do you agree, then, that you don't have jurisdiction, or those assets aren't frozen, only assets in Nevada and Utah would be subject to the receivers? We would agree. You agree to that? If we did not comply, we would not have in rem jurisdiction over those assets in other locations. There are cases that suggest that you can seek leave to file, even if it's untimely. So you're not contending that this asset freeze covers any assets of any of the defendants, unless those assets are in Utah or Nevada? Or California, because we also complied in California. I believe those are the only states, Your Honor. So if there's an asset of Rototrans that happens to be in New Jersey, you do not take the position that that is a frozen asset? I don't want to say that, Your Honor. I believe the asset would be subject to the asset freeze that's in the preliminary injunction order. My client would not have obtained jurisdiction, and the district court in Nevada would not have obtained jurisdiction over that asset. Can Rototrans sell it, assuming that there's something there in New Jersey? Can they dispose of it without violating the order? They cannot because of the asset freeze in the preliminary injunction order. Well, that doesn't make any sense. If you don't have jurisdiction over the asset, how could you be freezing it? Well, there's really two different issues, Your Honor. The court issues a broad asset freeze, and in this case issued a broad asset freeze. But if you don't have jurisdiction over the asset, how are you affecting it? The receiver, the defendants are bound to comply with the asset freeze if they're served with the preliminary injunction order. However, the receiver in that hypothetical instance wouldn't have jurisdiction over the New Jersey asset. So it's just sitting out there with nobody in charge of it. That's correct. And what typically happens, Your Honor, is that the receiver, as promptly as possible, as he discovers the location of assets, complies with that statute to obtain jurisdiction. But I thought the time for it runs from when the original order runs. Yes, the 10-day rule does. But as the Ninth Circuit has noted and other courts have noted, I believe in the Ninth Circuit, it was United States v. Arizona Fuels case. There's a very practical policy. Oftentimes the receiver doesn't know in the outset of the case where all the assets are located. But this is not an issue. While it's theoretically interesting, it's not an issue in this appeal. There's no dispute with respect to the compliance with 754 for the purpose of my client obtaining in rem jurisdiction over the assets. Over anything in California, Nevada, or Utah. Correct. Correct. Counsel has constructed this argument. I'm sorry, Your Honor. No, go ahead. Counsel has constructed this argument to say that we didn't comply with 754 because we didn't record notices of Liz Pendence. That's simply a made-up argument that has no basis in any case citation or any statutory authority that has been submitted to the court because it doesn't exist. Now, counsel today has mentioned the Ross case, the Ninth Circuit Ross case. That case was not addressed to the issue of in rem jurisdiction under Section 754. It was addressed to the issue of personal jurisdiction when a receiver brings an ancillary action against a third party. And counsel, with due respect, is conflating the personal jurisdiction that one may obtain with a summons and complaint in conjunction with a recordation under 754 versus in rem jurisdiction that the receiver obtains with the compliance under the statute. We did not have to serve the appellants with a summons and complaint. We did not bring an action against the appellants before Your Honor. This is not about whether or not we should have brought them. The ultimate position is under that Ross and Vincenti and whatever else they're relying on does not require any notice in hearing to the nominal title holder to, in order to freeze the assets if, in fact, the assets are under the control or there's reason to believe they're under control of the original name defendant. Is that your position? Yes. Our position is that we did not need to bring a lawsuit. We were enforcing the preliminary injunction order because the preliminary injunction order extended to affiliates of the named entities. And in this case, the appellants, as we have demonstrated in the record, are affiliates of the named entities. In addition, the preliminary injunction order extended to assets of Jeremy Johnson. And we have demonstrated that most, if not all, of these assets are assets of Jeremy Johnson. For example, the three entities which Ms. Porter represents, Zibby, Zibby Flight, and Orange Cat, are all owned 50 percent by Jeremy Johnson. So under the clear language of the preliminary injunction order, those are assets of Jeremy Johnson. We didn't have to demonstrate that he solely controls them. We just had to demonstrate that he had a 50 percent interest in them. So those assets are also a property of the receivership estate. And in addition to showing that these are affiliated entities, the reason why they're affiliated entities, let me take a step back, if I may. The only law before the court is that an affiliate is when there's some common ownership or control. And we cited both the Utah Uniform Federal Uniform Fraudulent Conveyance Act, as well as the Bankruptcy Code for that. And that exists when there's a common ownership of 20 percent or more by the named entity and the affiliate and the entity at issue. I'm looking at the Ross case, and I'm trying to understand where the limitation that you're suggesting appears in it. The limitation, Your Honor, is that in that case, the receiver attempted by way of motion to bring in assets owned by third parties under a motion procedure, as opposed to bringing ‑‑ and they alleged that those third parties were wrongdoers under the SEC Act. No, that they didn't do. Well, they did eventually, but they said you could. But they said if they hadn't been doing that, it would have been okay. Yes. Now, the defendant is not a real party in interest, but he does have to have a, as I understand it, a notice, some notice in hearing. You can have a truncated procedure. You don't have to have full due process. No, actually, what we're ‑‑ A mere custodian is generally entitled simply to notice and an opportunity to be heard. A party alleged to have violated a securities act must be treated as any other defendant under 42 process of law. My understanding is that that's the argument that's being made. Correct. That she may be a mere custodian, but she still is entitled to notice and an opportunity to be heard. Correct, Your Honor. I think Your Honor is ‑‑ Before her assets are covered by the injunction. Yes. And the differentiation, Your Honor, is that if you allege wrongdoing, you need to bring an adversary action against that third party. If they're a mere custodian of assets that are covered under the preliminary injunction order, as in the case at Barr, then you only need to provide a notice and a hearing. In fact, I think they ‑‑ But the question is whether she's covered before she gets the notice and the hearing. The answer we contend is that she is covered under ‑‑ because both the San Vicente case as well as the case that was abrogated on other grounds, I believe it's called American Capital Investment, if I may find my ‑‑ Yes, Securities and Exchange Commission versus American Capital Investments. Both of those cases said that unnamed entities such as affiliates or subsidiaries may be included in a preliminary injunction order for the purpose of reaching out and giving the receiver jurisdiction or control over the assets of those parties. And San Vicente, which appears to be the case that they seize upon the most, was very clear. In the San Vicente order, subsidiaries were covered, unnamed subsidiaries. And in that case, even though the partnership San Vicente was not named specifically, its assets were in possession or control of the defendant, American Principals Holding, and its subsidiaries. But all of these cases, I mean, because San Vicente received notice at all stages of the receivership proceedings and had every opportunity to participate in the proceedings, the fact that it was never named as a party in the proceedings does not violate due process. And I understand that, but I don't understand whether before they had notice at all stages of the receivership proceedings and an opportunity to participate, they're ‑‑ she's covered. Well ‑‑ What authority do you have for that? Well, again, Your Honor, I believe the law is clear that ‑‑ Where? At the beginning ‑‑ well, I think under both San Vicente and the American Capital Investments case, nonnamed parties can be covered under a preliminary injunction so long as the assets are deemed to be assets of the receivership estate. And in this case ‑‑ Then why do you have to give them notice or an opportunity to be heard at all, ever? I'm sorry, Your Honor? I mean, it is clear from these cases that you have to give them notice or an opportunity to be heard, right? That's true, Your Honor. All right. When? At the end of the whole process? Retroactively? I mean, that's what I don't understand. Well, in this case, Your Honor, after the initial preliminary injunction order was issued, my client took control over many, although not all, of the properties of the various appellants before Your Honor. And at each time when we attempted to take action against those assets, liquidate those assets, these appellants were notified. So the notion that appellants did not know about it until ‑‑ Prior to the clarification motion they were notified? Prior to the clarification motion, that is correct. There was ‑‑ Notified and given an opportunity to go to court? Yes, there was. By notice motion, we served all of the parties that were affected with our efforts to liquidate the property of the appellants. And sometimes they came in. In fact, Mr. Studebaker's client came in, I believe, on more than one occasion opposing our efforts to liquidate certain of the property of Mr. Studebaker. All right. My understanding is that with regard to Ms. Charlotte Johnson, we're basically talking about the house. Is that right? Well, yes, Your Honor. And we have taken ‑‑ the reason why the issue about whether we should have taken control in January of 2011 or March of 2013 is a moot point is this. The preliminary injunction order precluded the receiver from taking possession of Jeremy and Charlotte Johnson's house.  So the receiver never took any steps at all to obtain possession or control of that house and still doesn't have possession or control of that house precisely because the preliminary injunction prohibits it. So, Your Honor, even assuming that we couldn't take control prior to notice and an opportunity for hearing, the point ‑‑ So that's not the asset that we're talking about that was used to pay the lawyers? Correct. The point is moot because we've never sought to obtain control of the house. I thought you eventually did, except for the quilting ‑‑ I'm sorry, Your Honor? I thought eventually you did, except for the quilting store. I thought it wasn't in the preliminary injunction, but in the motion for reconsideration ‑‑ for clarification, you did at that point. No. In the motion for clarification, we saw a determination that the assets titled in the name of Charlotte Johnson would be considered receivership assets. Including the house? Including the house, but we were never seeking, and the clarification motion did not seek, to take possession and control of the house. And the receiver, even standing here today, believes that the clarification order in conjunction with the preliminary injunction order, they have to be read together. So if she uses a mortgage on the house to pay for something, that's not a violation of the order? It is a violation. It's still an asset of the receivership estate, but we are precluded from taking possession and liquidating the asset without further court order. It is, however, and the court found below in the contempt hearing that we brought when the asset was transferred, that it was clearly an asset of the estate. It was clearly an asset of Jeremy Johnson's, and therefore, it could not be encumbered or liquidated. The issue of whether or not Charlotte Johnson may have some beneficial interest in that home has never been determined, and it's not before Your Honor today. The facts are undisputed. So what does she have a, so your position is that she has no right to a hearing, to a notice and a hearing with regard to the question of whether the assets are part of the estate and she cannot use them. She only has a right to a notice and a hearing before you actually physically take the assets and liquidate them. But she can still violate the order by using the assets for her own purposes without a notice and hearing. That's your due process position. I don't believe that's my position, Your Honor. Well, that's what I understood you to just say. You said that before. I understood you to say that from the outset, this house was part of the, of Jeremy Johnson's estate subject to the freezing order, and she had no right to notice and hearing of it. And that, therefore, the fact that she, and since she would have never taken possession of it, she still doesn't have a right to notice and hearing of it. Well, with respect to the second point, she's had a notice and a right to a hearing as represented by the clarification motion. With respect to the first point, the house is not divisible, Your Honor, in the sense that the court determined at the outset of the case, when the preliminary injunction was issued, that this was a home that Jeremy Johnson resided in and was, therefore, determined to be property of the receivership estate. We further developed uncontroverted evidence, and there was never an offer of proof made at the clarification order or at any other time. We further proved that Jeremy Johnson was using the house as his own personal piggy bank, that it was originally transferred not to Charlotte Johnson's name, but to Zibi, which is 50 percent owned by Jeremy Johnson. So it was originally owned by an entity that, without any controversy, is at least 50 percent Jeremy Johnson's. And then on the day before it was transferred to Charlotte Johnson — excuse me, on the day after it was transferred to Charlotte Johnson, Jeremy Johnson used — But what did Charlotte Johnson do, if anything, that violated the asset freeze order before she was actually brought into the case and given notice in 2013? The only violation that I can think of now, Your Honor, and the court below determined this in conjunction with our contempt application, was in attempting to transfer the asset to the Christensen and Jensen firm as legal fees. Which asset? The mansion, the Woodsview home, Charlotte and Jeremy Johnson's home. That would have been a violation because there are multiple provisions in the preliminary injunction order that said that this was Jeremy Johnson's home, and he could not dispose of assets. So even if Charlotte has some interest in it, notwithstanding the fact that she even has legal title to it, she still could not have transferred it without going to court and making some showing, making some argument as to why it was really hers, separate and apart from the receivership estate. I would like — I'm running out of time. I think I've overstayed my welcome here. But we can't lose sight of the fact that the order that was entered by Judge Due below provided in the order itself at paragraph 3C, it says if any party affected by this order believes that there should be some property accepted, taken out of the receivership estate, then on notice motion, I can make that determination. This motion and the order that supported this motion was entered almost, I believe it's nine months ago, and at no point have any of the appellants sought the relief that was afforded them by the very order that's been appealed. And that's because they have no evidence demonstrating that any of these assets are other than property of the estate, in the sense that they are owned or controlled by Jeremy Johnson or an entity that he owns or controls, or are owned by an affiliate that is an entity with common ownership between Iwerks, which is 100 percent owned by Jeremy Johnson, and these appellants, which are all owned at a minimum of 50 percent by Jeremy Johnson. I'm out of time, so I would thank the Court for its time. Well, you left 14 seconds for your partner. I know, Your Honor. I just noticed that. I apologize. Yeah. Your Honors, may it please the Court, I'm John Andrew Singer, and I represent the appellant, the Federal Trade Commission. One thing which I'd like to focus on here, Your Honor, is what is indisputable in this case, from the preliminary findings of the Court, is that Jeremy Johnson, his company, Iwerks, and various affiliates and colleagues fued consumers out of hundreds of millions of dollars. Mr. Johnson, through Iwerks, then directed over $50 million of that to various entities that had nominal interest from friends, colleagues, and relatives. It's imperative in a situation like this that a court have the authority to authorize a receiver to take plenary control over any of the receivership estates. The reason why this is so important is part of the relief that the FTC ultimately is seeking if we prevail on the action, which is, among other injunctive relief, we would like to provide consumer redress, or excuse me, redress to the consumer. The question, at least the question that we've been talking about all morning, is a strictly procedural question. It's not going to stop you from taking control over anything, as I understand. So the question is, what are the procedural requirements with regard to the third parties who are, you say, are nominally in control of these assets? But you could be mistaken. I think that the procedures were correct, that the preliminary injunction can create a receivership estate over any asset that's part of the receivership estate. I realize it's somewhat tautological. But in this case, the receiver had exhaustive reports showing what things came from Iwerks and what was controlled by Jeremy Johnson. But I think the procedural issue here for the motion on appeal is that before the clarification order was entered, and there may have been some question, for example, to Ms. Johnson or the various appellants, as to whether or not they were part of the preliminary injunction, they had notice and they had opportunity to be heard. And that's... Who had, of the preliminary injunction in the beginning, they had notice? I think that some of them definitely had notice. Which ones? I think essentially all of them, because Mr. Fielding and Anthon were defendants. Jeremy Johnson was at least a 50 percent owner, a 50 percent member, I think is the more proper term, for various LLCs. And he clearly got notice of everything that was happening. And Charlotte Johnson's, I understand, did get a copy of the preliminary injunction was in attendance at the... Yeah, but we don't, I understand that. But we don't usually, we usually have somewhat more formality than that in terms of who has an obligation to say something. Well, I think the issue here is... I think the issue here is, did they have an opportunity to, did they have notice and opportunity to be heard before the receiver attempted to take possession and or control of the various receivership assets that are issued? Well, except, if somebody is saying about your house, you know, it may be that this is in, you have title to this house, but you can't do anything with it. What, I mean, what difference does it make? I understand it makes some difference if they're taking the house out from under you and trying to sell it as opposed to letting you live in it but not get any, take any assets out of it. But they're still controlling your ownership interest in the house if you have an ownership interest in the house. So if your position is that, in fact, it is my house and you shouldn't be able to do with their houses, then the fact that they're not actually taking possession doesn't seem to me to be a distinction for due process purposes. Well, I think it is a distinction, Your Honor, because what's trying to, what the FTC and the receiver attempted to do here is to maintain the status quo. They're not saying you can't live in the house. They're not saying we're going to sell the house from underneath you. Well, the status quo is that she has title to the house and ordinarily if she went to a bank and said this is my house and lend me $500,000, they might well say fine and I'm going to use that money to go buy a lawyer, hire a lawyer. And you're saying she couldn't do that. That's correct because ordinarily most people aren't subject to, don't have their property subject to a preliminary injunction. Well, yes. So all I'm saying is therefore her purported ownership interest has been interfered with even though the house has not been taken out from under her. And the question is what due process rights does she have before that can happen? The due process rights. You're saying none. I'm saying the due process rights she had were at the clarification motion where she said in fact I don't think my house is part of this. But she's saying that she is being faulted for what she did before the clarification motion. That's not before this Court, Your Honor, because the receiver. What do you mean it's not before this Court? This is the clarification motion going forward as the FTC. I understand, but she's saying I shouldn't be, you shouldn't be able to treat me as having been covered by the injunction before I was given notice, in any respect, before I was given notice and an opportunity to be heard. Well, I think she did have notice and opportunity to be heard in part, both at the injunction, at the. Well, you're saying that when one of these receivers, when the receiver is moving and he's grabbing assets, he's got to move quickly, and there was a 50 percent ownership by the husband. And that's enough to give you the power to grab that asset. And that if you, then you have to move quickly. If you don't move quickly, it may be gone. That's correct. That's exactly correct, Judge Prager. And what happened here, in fact, is the preliminary injunction came in and almost immediately after the house being transferred from Zibby, who it clearly did get notice of this, to Mrs. Johnson, over $3 million. The house got a HELOC of over $3 million in a loan, which was used to buy stock to prop up the bank that was permitting Mr. Johnson to conduct his fraud by processing his payments. Later on, the house, again, was attempted to be transferred by quick claim deed to the law firm. And it's imperative that the receiver have the ability to be able to marshal and preserve assets. Again, not on a final resolution, but on a preliminary basis until the ultimate case is there. Because if defendants have, if you were to buy a defendant's position, then by a defendant like Mr. Johnson simply transferring assets to various friends and family and different entities in a very complex manner as happened here, he can attempt to hide assets and not make them available if the FTC, pardon me, if the FTC ultimately prevails. So it's important that the receiver be able to be nimble, be able to act efficiently, and be able to act in a cost-effective manner in part because every dollar that's he's doing an excellent job is one less dollar available for consumer redress. So, yes, Your Honor, it is imperative that the receiver be able to act quickly. And that's the point you're making. That's the point that I'm making, Your Honor. You've made it. I have made it. And I can see that I'm out of time. And if there are further questions, I would be glad to try to answer them. If not, thank you for your time. Do you rely on, in your argument, on Section 754? The receiver did. We relied on San Vincente in part. And if you'd like, I'm happy to take a minute to explain our position on that, Your Honor. Well, what is your position? Our position on that is this, Your Honor, and I refer specifically to 962F second at 1407. It's the excerpt that I'm going to refer to. And that's, the Court said, the situation, as the receiver said, and I'll summarize it is, there was a receiver, excuse me, a defendant, APHI, through a subsidiary, APHI controlled San Vincente, which was a limited partnership in its asset. And what the Court said was here there is sufficient context with the forum to support assertion of quasi and rem jurisdiction over San Vicente's property without offending due process requirements. It is undisputed that the district court had jurisdiction over the defendant, APHI, and the defendant controlled San Vincente and all of its property through the intermediate subsidiary. We say that's exactly the situation here, that Jeremy Johnson and Iwerks funded and controlled the ultimate entities that are on appeal here. There's a second part of that that then goes on to note that it was a California corporation. Are you saying that was just? What I'm saying is I think that was the icing on the cake, Your Honor, that in fact what I just quoted was both a necessary and sufficient condition for the Court to exercise quasi and rem. So are you not relying on 28 U.S.C. section 754? We are relying on that. We think it could be, we think that the receivership could go forward under 754, and that's I don't think an issue here. We're also saying if 754 for some reason we're not in compliance with, in complied with, then there would be quasi and rem jurisdiction under San Vicente, and that the appropriate reading of San Vicente is again quasi and rem jurisdiction and the fact that there happened to be California ties there simply reinforced the fact that there was control by the ultimate defendant. And again, we believe there was notice and an opportunity to be heard here since the parties were at the hearing and did have notice. But what about property that might be outside of California or Utah or Nevada? That would be an interesting question, but my understanding of the record from the receiver's extensive report, exhaustive reports I think would be a better way to put it in the declarations of Mr. Cain, is that all of the assets that are at issue here are in either California, Nevada, or Utah. It's an interesting hypothetical question as to what would happen if they were not, but I think that's simply not a factual issue here that the Court needs to resolve. There's no evidence of assets outside of those three States. So you're not maintaining that there are assets somewhere else that you're entitled to? We are not at this time, though, as you may have gathered from looking at the records here, it's always conceivable that new assets will come up because Mr. Johnson, it would appear, purposefully put up a very complex system to keep his assets in, hide his assets, however you'd like to do it, or lessen the burden. Can you just tell me one last time, what is it in San Vicente precisely that you're relying on? San Vicente, as Judge Amon was saying, is very precise about the fact that San Vicente is not placed in the receivership without notice in a hearing. So what is it you're relying on with regard to the quasi-in-rim jurisdiction over the asset? Certainly for the order on appeal, there was notice and opportunity to be heard since the parties knew about the hearing. I'm sorry, what? Certainly on the order on appeal, there was notice and opportunity to be heard since the parties appeared, knew about the hearing, in some instances actually filed something in writing, and all of them had counsel who appeared. You mean here? Yes, on the order on appeal. Yes, but the question is at what point? We understand that going forward. The question is at what point is this a nominal person, say San Vicente, subject to an order entered nominally against somebody else if they haven't themselves had opportunity for notice in hearing? And or I guess your position is that she did have opportunity for notice in hearing? I think the issue is for the preliminary injunction itself, there is no accusation of wrongdoing. I don't think this applies to the entities that are 50 percent owned by Mr. Johnson. We're really focusing on Mr. and Mrs. Johnson's house. But I'm trying to understand what in San Vicente solves this problem. I think in San Vicente solves this problem is the record is clear from what the receiver has done that in fact Jeremy Johnson Iwerks funded and controlled the assets that are at issue on the order on appeal. And that as a consequence of his control and funding, because Iwerks was 100 percent owned by him, that as long as there was sufficient notice. All right. The only defendant, I'm reading from San Vicente. The only defendant before the district court in the SEC action was Apthie. By including the property of San Vicente in the receivership order, the court exercised control over the property of a legal entity not before the court. Therefore, we must determine whether a district court has the power to include the property of a non-party limited partnership in a receivership order. And the answer, one answer was there was sufficient contacts because they had jurisdiction under Apthie and Apthie controlled San Vicente. But although it was not named as a party, it did receive actual notice of the receivership proceedings because it was a subsidiary of a limited partner. Now, I mean, is that your ultimate position, that they had, because of their relationship with Jeremy Johnson, there was adequate process? Is that what you're saying? I'm saying that that was the basis, yes, that was sufficient notice because Jeremy Johnson controlled it. I wish you'd said it. I'm sorry if I didn't say it. I'm sorry if I was a little obtuse, Your Honor. Well, when you grab the house, is there any notice posted on the house or any of these  They didn't grab the house. They didn't grab the house, Your Honor. What happened, as I understand it from the record, was that the house was subject to the receivership estate, but there was never possession or control exercised by the receiver until, as I understand it, he found out that the house had been encumbered by a home equity loan, at which point, and also later on by a quick claim deed to Mrs. Johnson's attorney and said, look, sent to the court, look, this asset's part of the receivership estate. We don't possess it. We, the receiver, doesn't possess it. The receiver doesn't control it in the sense that he can say who lives there, who comes in and out, but the status quo has to be maintained. It can't be encumbered. It can't be transferred because this is part of the receivership estate on an interim basis, and, you know, ultimately, if Mr. Johnson prevails, Mrs. Johnson can do whatever she would like to do with the house, as well as the other assets. But at this point, on a preliminary basis, the important point is that the court, through the receiver, has to have the authority to be able to maintain the status quo, preserve and marshal assets. Well, I understand it. I've handled a number of equity receiverships myself in the past, but you were aware of the house as being an asset. I'm not sure at what point the receiver became of the house. I presume fairly early. You just told me it was in a preliminary injunction, so you were. Yes. Yes. Yeah. And, you know, and Mr. Johnson has been living in the house, as I understand it, from well before the preliminary injunction, and it was paid for indirectly by Iwerks. Iwerks gave the money to Zibby, which took title of the house, and then Zibby transferred title to the house to Mrs. Johnson for no consideration. And, again, you know, when one owns a multimillion-dollar house, presumably if you have evidence that you paid some consideration and, in fact, have more than a nominal title, you would have come forward with that either at the hearing on the clarification motion or, as the receiver's counsel pointed out, the order on appeal has two mechanisms for essentially challenging the order on appeal. One is an informal process to go to the receiver and show you have evidence, for example, you know, a check for $4 million paid to Zibby, saying I own the house. I know how I paid for my house. I presume all of you, if you own houses, know how you paid for yours. The second opportunity would be to make a formal motion with the court, again supported by evidence. I think it's significant that since this order was entered on March 25th, 2013, so almost ten months ago, more than ten months ago, that, in fact, none of the appellants have come forward with any evidence, not one iota, suggesting that there was anything wrong and that, in fact, these aren't receivership assets. And, again, even if they have issues, you know, other issues about maybe going formally to court or jurisdiction, there's an informal mechanism and they have not done anything to attempt to show they own this. To the contrary, the receiver put in two exhaustive reports, plus declarations by Mr. Cain, who works with the receiver, that these entities were controlled by Jeremy Johnson and funded by him or entities he controls. The evidence here, you know, again, this is just a preliminary basis. I fully acknowledge that. But what we're just trying to do now is preserve assets and preserve the status quo so that if the FTC, or I'd like to think when the FTC prevails on the merits, there will be a basis for providing consumer redress. And, again, the bottom line here is a defendant shouldn't be allowed to set up complex shells through friends, family, and, you know, colleagues to be able to put their assets in all different jurisdictions, in all different formats, and be able to say, ha, FTC, ha, receiver, you can't get to them because I've outsmarted you. If you did, presumably all of our defendants in every FTC enforcement action would do anything they could to dissipate and hide assets. And the equity receiver would be frustrated in doing his or her work because of the cleverness. We know all this. I'm sure you do, Your Honor. I'm sorry if I'm not adding anything at this point, additional at this point. And since I am way over my time, again, unless you have any questions, I think my best, I will thank you for your time. We'll send you a bill. I, Your Honor, I've got the full faith and credit of the U.S. Government behind it, so I'm sure you'll be paid eventually. You haven't heard about sequestration, have you? I've heard about sequestration. I've heard about furlough. So my full faith and credit to you is the government are not bad, but a little different. Paid, but delayed maybe. Thank you, Your Honor. Yeah, later. May I have the three minutes? Yeah, yeah, sure. First, I think I need to clear up. I think there may have been a misstatement by counsel inadvertently when he suggested that notice of the preliminary injunction was given to Zibby and that Charlotte Johnson was there. I don't believe that's the case. But in any event, even if she had been at that preliminary injunction hearing in 2011, she would have heard no reference to her as being part of the receivership estate. But she would have heard that the House was covered by it. Except not. That never was mentioned at the hearing. The receiver actually proposed an order later saying we are not doing anything with the House. And the judge signed it. So in fact, this was a pattern in this case. The only other thing that was ever mailed, because there were references that supposedly things were served on Charlotte Johnson later, the only other thing that was mailed to Mrs. Johnson was this, it was a motion for sale order on a different piece of property in May of 2011. And if I may, this is extremely important, because this is how the receiver, whether intentionally or otherwise, gets around the judge saying why isn't this person in front of me if they're wanting me to say her assets are part of the receivership estate. Because what the receiver did on the thing that he mailed was it said in the motion, this motion does not seek a determination of the extent to which the interests held by these other individuals, which included Charlotte Johnson, are in fact beneficially owned or controlled by Jeremy Johnson and therefore belong to the receivership. They're telling the trial court judge, you don't even have to decide that, just go ahead and let us sell the property. And in fact, I believe we quoted the dialogue, they said, after all, if it turns out not to be part of the receivership estate, they can always file a claim against the federal government. And that's assuming she hasn't filed bankruptcy, that she can find a lawyer, et cetera. Which gives the opportunity to go back to the district court under the district court's order and show why it shouldn't have been these assets present, correct? Well, we can't. We can't. See, first of all, remember one of our main issues is with respect to the timing. Right? The judge has already rejected our argument on the timing, and so we can't go back to her and try to move for reconsideration on the timing of when this would have been. But you can go back to show the property shouldn't be subject to the order, correct? That they're not, you should be able to defend on the fact that they're not assets of Jeremy Johnson or assets of any of the corporate defendants. You have the right to go back and do that in the district court. And we're going to work. And we're going to work. Prospectively. Well, we can do it, although we're on appeal on this order, and that does limit our abilities jurisdictionally to what the court can or cannot do with the order that is currently on appeal. So that's an issue. When they say we haven't done anything to try to protect ourselves, we did the opposite. We brought it to this court, the exact issue that we have a problem with, which was the lack of minimum contacts and the lack of service, the lack of notice and opportunity to be heard prior to March. But all with respect to the original preliminary injunction. Yes. After March, you got all of that, correct? After March, I mean, if this appeal were simply just about after March, we probably wouldn't, I don't know that we would be here. And this is important to you because of the pending contempt motion, correct? Well, the judge did make a ruling that it was in violation of the, you know, and I apologize to the court, I don't think any of us notified the court of that. The court did make a ruling that it was in violation of the preliminary injunction because the preliminary injunction went back to 2011. She did not impose contempt sanctions because she said she did not find it reckless for us to have accepted the, but it is still an order of the court that we violated the court order, which is a reportable event for attorneys in Utah. And second, though, it comes down to this, the ability to use the equity in the home. Because we advise the trial court if by chance we can convince the Ninth Circuit that she was entitled, that Mrs. Johnson was entitled to notice before the preliminary injunction. Cheryl addressed title at the time of the preliminary injunction. She did. She had exclusive title at the time of the preliminary injunction. She had exclusive title before this lawsuit was filed. And we would be able to go back and reinstate the quick lien fee to be able to use whatever equity is in there, primarily to pay for expert witnesses, frankly, because we hear all of this about bilking, et cetera. We have five expert witnesses have filed reports in this case saying the FTC, disagreeing with the FTC's characterizations of what Jeremy Johnson was doing. And one of the things I have to do to defend my client, Charlotte Johnson, is to show these gains are not ill-gotten. In other words, that the FTC is mostly smoke. I only had, if I could, just one or two brief responses. The receiver emphasizes quite heavily the American capital case, and I would, in fact, ask the court, yes, please look at the American capital case. Well, the property hadn't been sold. It hadn't. Has it been sold? Well, the attempt has been thwarted. And if you say sold, I mean, it was an attempt to try to use the equity that was still in it. Right now, it is because until this appeal is resolved, it's back in Charlotte Johnson's name, pending the outcome of this appeal. Because if we did advise the trial court, we would seek a reinstatement of the quick lien deed if, in fact, Charlotte Johnson and her assets were not sold subject to the preliminary injunction until March of 2013. But if I may, and I promise I will just do a minute here, the American capital case supports us quite strongly, I think. It talks about Schaeffer versus Heitner, which said exactly what we've heard today, which is when you interfere with someone's ability to use or alienate their property, you are, in fact, interfering with an interest of the person. Schaeffer versus Heitner said, same standard, in rem, in personam. Same standard, because it's a fiction. It's the old Pennoyer versus Neff fiction that's no longer valid. That in rem doesn't really affect the ownership interest. And Schaeffer versus Heitner said that's not valid. And then American capital then went on for half a page talking about San Vicente and how San Vicente supports the ruling in American capital because appellants do not contest there were minimum contacts between the forum and themselves, nor do they contest that there was notice and an opportunity to be heard. This court in American capital read San Vicente the same way that we do. And I think, let me just check to see if there was anything I just felt I had to address, but I would actually. It was fun to be able to cite Schaeffer versus Heitner, which we learned about in law school, but that is an important decision that was very influential to the court in San Vicente. Like everyone else, I'm over. Unless there are further questions, I'll submit it. We're going to take another brief recess.
judges: Amon, Pregerson, Berzon